Good morning. May it please the Court, it is my pleasure today to represent the Gormleys. The Gormleys are here today with a number of their supporters who are aware of the grim circumstances they face if forced to return to South Africa. This is a claim for asylum, and the facts of the case are actually fairly simple, and most of the facts aren't even disputed. The only issue, really, is whether or not the fact that they were unable to secure any employment and that their future prospects are very dim is sufficient to prove that there is a probability of deliberate imposition of substantial economic disadvantage. The policies were implemented perhaps for good reasons. The government was trying to fix the problems that occurred because of apartheid. Unfortunately, they took one racist system and they replaced it with another, resulting that the individuals like the Gormleys lost their jobs so that they could be replaced by black individuals. Is there anything in the record that indicates just what that policy is? Is it a quota? Is it an absolute preference? There is some information in the State Department report that talks specifically about what the programs were, and in the Act itself, it says that the country. For example, the whites is a very small percentage. Can I say that your clients have exactly the same shot at employment as people of other races? They don't. Well, why not? If there's, let's say its population is three to one black, and the government is trying to get a workforce that is three to one black, there are three times as many blacks competing for the three times their three quarter share, and there's one quarter of the whites competing for their one quarter share. Well, the problem has been that traditionally, obviously, there's been an inequity, and there's been a lot more whites employed. So there are no positions open for white people, and the only positions that are open at this point are for people who are black or are colored. And actually, the proportion, I think, is closer to 85 percent of the country. Eighty-four, 85 percent is black or colored, as they call it, which is the mixed race or Indian, and the rest of it is white. And it was very definitely skewed during the apartheid system, but unfortunately, what's happened is when they are trying to reorganize it, you know, all the way along the line, there are mixed race. What happens is the people who are at the bottom rungs of the ladder, the lower levels, are the ones that were terminated first. And that's why both of these individuals lost their jobs. They were hardworking people, but at the lower levels. It's not the – that's why in the report that the judge indicated that the wealth is still skewed along racial lines. It's the whites hold a lot more money, but it's the rich whites, not the rest of the individuals. And so that's a great deal of their particular problem, and part of that is not only because they're white, but because they're from this lower socioeconomic group. Counsel, you – I think the act you're referring to is actually – you're talking about the employment equity bill? Yes. All right. That is in the record. Yes. And I guess what I was – where does it – where in this act does it single out people in your client's position to disadvantage them? It doesn't say, you know, whites are not to be hired, but what it says is that the positions need to be – the way that it's set up needs to be altered so that blacks and coloreds hold a certain percentage of the jobs. And the way it was implemented in effect was that people were terminated, and a lot of people have been – whites have been terminated. So it's – and that's one of the main differences between what we would consider an affirmative action program versus what I would call a racist program, because in an affirmative action program, you have multiple people applying for a job, and they're going to – one of the factors they're going to consider is race and deciding who to hire. In this case, what happened is not just that it was an affirmative action. This is a situation where people were actually terminated because they had to meet these racial quotas in order to have the government jobs and the contracts, and the vast majority of the employers were subject to these requirements. Ms. Edward, when you opened your argument – and I'm just trying to focus on the standard here that you're urging – you said something like the government had engaged in a deliberate infliction of severe economic disadvantage, but those weren't your exact words. But tell me again what it is that – in a phrase that you contend, that your clients contend the government's doing, and then why that falls – why you contend that falls within the legal definition of persecution. Well, as the Court's aware, persecution doesn't have to mean that somebody's being attacked. Although they had some of the racial animus problems which were detailed in the report, it can be severe economic repercussions. Is there a case? There's a number of cases. What's the legal authority in the Ninth Circuit that would say, assuming this were the case, that if the government of South Africa intentionally inflicted severe economic hardship or damage on persons of a white race, that that would be viewed as persecution? Well, the standard has arisen out of a case called Kovac, and that is cited in the brief. And it has been reiterated, and even recently, which yesterday I was reviewing once again, and there was a panel of this Court on March 30th that came out with a decision to be published called Chen v. Ashcroft. And again, they discussed the same standard that's been repeated again and again in Kovac, which is a probability of deliberate imposition of substantial economic disadvantage. Substantial economic disadvantage. And it's the same standard that's been repeated again and again in terms of economic. And in the case law where they consider this issue, the main factor that they looked at is whether or not a person is able to secure employment so that they can survive. And cases where they have found it not to be substantial economic disadvantage are ones where people were able to secure alternate employment. In our case, we have a number of news articles and other information, as well as the credible testimony of my clients, and it was found credible by the judge, that they were unable to secure employment. One, Mr. Gormley had just over six months that he had been looking, but his wife had been looking for over four years without any hope of finding employment. And in terms of deliberate imposition, if we have a law, which we do in this case, that the government has passed, then clearly that meets the deliberate imposition. And, of course, as we indicated in our reply brief, that doesn't have to be to punish whites. That doesn't have to be the basis, as long as the impact is, in fact, that they are singled out based upon their race. And suffer this punishment. Now, if there weren't terminations and inability to get jobs, if what was involved was an affirmative action program, would you take the same position? I don't think that we could, because I don't think affirmative action alone is the basis of persecution. I think it's more a factor of a discriminatory effect. And I don't think it would rise to the substantial economic disadvantage. I think the reason why it's so horrible is they had good jobs. They were able to work. There is no indication that their performance was unsatisfactory in any way, and yet they were terminated. And because they were terminated, they simply cannot find another job, period. I'd like to reserve my final minute, if I might, unless the Court has any additional questions. I have a conceptual question under our case law. Yes. I'm reading from Babala, I guess, right now, where it talks about economic persecution. And it says, We have recognized that purely economic harm can rise to the level of persecution where there is a probability of deliberate imposition of substantial economic disadvantage upon the applicant on account of a protected grant. Now, does that mean that the law has to be aimed at them specifically, or if it's a generalized law where others are being treated similarly, does that take it out of the realm of persecution of the individual? They can be in either category, where it's directed at them, or it can be similarly situated individuals. Obviously, either one of those would be sufficient. In this case, the law wasn't passed specifically to hurt the Gormleys, but the impact was to affect the status quo of what had been substantially, you know, and resulted in direct impact on them and others similarly situated. So I think it meets the requirement without any particular issue on that. There could be hundreds of people in the same situation as the Gormleys. There could be hundreds. There could be thousands. But the way the law reads and the way our immigration law, and specifically the asylum law, and, you know, in terms of its economic consequences, I don't think it matters how many people are impacted. What matters is whether they were impacted and whether they were singled out based upon these particular factors. If there were a law that said all persons of Chinese ancestry shall not be allowed to work in South Africa, that would be inflicting a severe economic disadvantage on a protected ground, I guess, on the grounds of race. I believe it would. You'd say that would be persecution. I would say that would be persecution unless you have a situation where people were extremely wealthy and so they weren't actually suffering the severe economic persecution. I think that's part of it, too, is that they actually have to be not able to have employment or they don't have resources to provide for themselves. That's part of it, because what you're trying to do is avoid them becoming destitute, homeless, you know, those kinds of issues. If they have other resources, I think that there could be an argument made that even though the government passed this law and it could be persecution in individual circumstances, it might not be depending on what that person's individual circumstances were. That's why you have a case where I think it's Khorasani v. INS where you have an Arab-Israeli who one of his businesses closed down, but other businesses were allowed to operate. So in your view, the fact that some of Mr. Gormley's white South African friends were able to regain employment is irrelevant because we look at the particular circumstances of the Gormleys. He said in his testimony that very few of his friends were able to secure any kind of employment. And I think it does have some impact, but I think it's a minimal impact on this case because he himself was unable to secure it and most of the people are unable to secure it. And so the question is whether there's this probability. It's not could any whites ever get a job in South Africa. The question is, is there a probability that he will suffer this substantial economic disadvantage, which they have suffered. Right. May it please the Court. I am Blair O'Connor, representing the Attorney General in this matter. Your Honors, this case is best summed up by a few sentences in the Service's Notice of Intent to Deny Petitioner's Asylum Application, which states that South Africa's Affirmative Action Program was designed to benefit the previously disadvantaged black majority population and the mere fact that portions of the white minority population were necessarily discriminated against as a result of the program does not support a finding of persecution. Well, let's – I don't know that we can view it that simply. I mean, Ms. Edward concedes if what was involved was an Affirmative Action Program that related to hiring of people for open jobs, she wouldn't be asserting this claim. But she's saying there's something different if the government has a law that requires the firing of people of one race and if they're in a position where they're not realistically able to get another job and they're not independently wealthy, they can't start their own business. So she says then there's a severe economic disadvantage being inflicted on them on account of their race. So I don't think it can just be answered adequately by saying Affirmative Action is a good thing. Yes, Your Honor. Well, the government would say that this is an Affirmative Action Program. I read the Employment Equity Act in its entirety last night, and nowhere in there does it state that employers were required to terminate white employees in order to replace them with black employees. In fact, on page 330 of the record in Section 12-3 of the Act, it states that designated employers were not required to take any decisions concerning an employment policy or practice that would establish an absolute barrier to the employment prospects of people who are not from a designated group. Well, let's assume that's what it says literally on its face, but assume that the Gormleys credibly testify that the way it's implemented, it means they're going to be fired and they can't get another job. What's the result then under our precedent? I think the result then, Your Honor, is that you have non-government entities, these private employers, and by the way, if they're mis-implementing the Act, not implementing it according to the way the government wrote it, then that is not persecution sanctioned by the government. In which case, if the employer looked at the Act and said, well, my reading of the Act is that I need to immediately fire one-third of my white employees and replace them with black employees and the employer is misreading the Act, then that's not persecution that's sanctioned by the government because the government did not. Sometimes there's some precedent that permits a remedy of asylum for private action if it's action the government can't or is unwilling to control. Yes, I understand. The government completely recognizes that line of case law. But again, here, there's no showing by the Gormleys that the government was aware. Also, we would note out that the Employment Equity Act does contain provisions in which employees may appeal any decisions taken underneath the Act. We don't have any evidence in this record that they tried to appeal their own termination, saying that, look, this is in violation of the Act. The law was not written that way, and I challenge this because this employer is not adhering to the way the law was written. Okay, thank you. The supposition that an affirmative action program is necessarily persecutory when applied to benefit a majority of the population, thereby disenfranchising a minority of the population, fails to take into account that the purpose of such programs is not to persecute the disenfranchised but to benefit the previously disadvantaged. A ruling to the contrary in this case, Your Honor, would essentially render all affirmative action laws acts of persecution, which is not what the Congress intended. Well, how much does intend under it? I mean, it's easy to understand what the South African government is doing. They're saying that a disproportionate number of the jobs were held by a white minority. Presumably a benign purpose. But the normies are arguing that, nevertheless, the impact on us is total. How much does intent play a part or purpose? Well, we would disagree that it was total, Your Honor. Again, the law specifically provides that designated employers were not required to take any actions that would totally bar people who are not from designated groups from obtaining employment. What if it did? I mean, suppose it just said for the next 20 years, because the way we figure out the population, you can't hire white. Well, Your Honor, if there was a law that specifically said every single business and employer in South Africa is strictly prohibited from hiring whites, then the government would concede that would be a problem. But that's not the case here. We'd also point out that the law would be a problem because even though the purpose was to remedy an imbalance, historical imbalance, purpose doesn't matter if the effect is great enough? Oh, the purpose still matters, Your Honor. But here, if you had a specific minority group, i.e., Caucasians, mentioned by name in the act, then at that point, you know, it's hard to justify that the purpose is still benevolent. Why does the government concede that if that were said explicitly in the act, that asylum relief would be appropriate? Are you conceding that? No, I'm not necessarily conceding that, Your Honor. I'm just saying that if there was a law that specifically identified a particular minority group. All right. Then just say the law said you can only hire blacks and coloreds. It doesn't say you can't hire white. It just says you have to hire only. Yes, Your Honor. Again, the case law in the Ninth Circuit states that motivations behind a persecutor's actions are still relevant and proper considerations for determining whether or not the aliens have established that any acts of persecution were on account of a qualifying ground. And if the purpose behind a law and the purposes behind the Employment Equity Act are stated to be to benefit the previously disadvantaged black population, if those purposes are benevolent and not specificatory, there's no racial animus against whites. That can't follow. That's like saying if somebody had a law that said we're going to say that no blacks can have work in our country and they're doing it to benefit white people, that that isn't persecution because they have a positive motive to give benefit to somebody. Again, Your Honor, if the law states that, then the showing that the motivation that there's a connection, the nexus, the relevant nexus is much greater if the government concedes that. The nexus there is much greater if it specifically identifies a single minority group. Look, it seems maybe I'm missing something, but it seems like the problems that are asserted by the Gornleys are problems on account of their being white. Now, whether it rises to the level of persecution or not, or whether the record compels the conclusion that whites are treated differently than blacks under the law, I guess is a different question, or treated differently in some way that would inflict severe economic disadvantage. Those are different questions. But isn't the whole crux of this case something that relates to a protected ground, their race? Yes, Your Honor. The government doesn't quarrel with the fact that according to their testimony, they were terminated because they're white. We do quarrel with the fact, though, whether or not there was substantial economic disadvantage. We would point out that for the nine months that Mr. Gornleys stayed in South Africa after he was terminated, he continued to receive severance pay, which was his full salary, in addition to receiving unemployment compensation from the South African government, which amounted to one-third of his salary. Therefore, we find it somewhat disingenuous for them to argue that they were provided no means of supporting themselves during the time they remained in South Africa when he was receiving one and one-third times his salary during that time. And we would point out that when he was terminated, he was given all the pension contributions he had made, and that's 27 years of pension contributions, Your Honors. That should not have been an insignificant amount. And also, as we point out in our brief, we would note that his brother, who was terminated in 1999 allegedly because of his race, 10 years later at the time that Gornleys left South Africa, his brother was still living off the interest from his severance pay. Now, they point out in their reply brief that while the brother, his job was a managerial position that had greater benefits, but still, I mean, we're dealing with 10 years versus the nine months that they stayed, during which they were receiving severance pay, unemployment compensation, yet they say that they exhausted their savings during that time. I don't know the history of this. I'm just wondering that during the era of apartheid, did we, did the United States grant asylum claims for blacks on the basis of apartheid? Your Honor, I'm sorry, I don't have, I'm not aware of that information right now, as to what the statistics were with regards to blacks getting asylum during apartheid. Does the government think that there's anything in our asylum law from the Supreme Court or from the Ninth Circuit that bears on whether, you know, two wrongs make a right? I'm not sure if I'm following your question, Your Honor. If what's being, if what South Africa is doing right now to the Gornleys is wrong, can it be justified by the idea that something was done by the government under apartheid that was wrong to the blacks in South Africa's try to make up for? I'm not sure I necessarily agree with that, but. Here's my point. I'm not really stating a principle that I think that has legal bearing here. I'm raising it only because it seems to me that we can't, as judges, get into what's right or wrong for the society. There, all we can do is look at our standard, which is, you know, are they being inflicted by the government or by private parties that the government won't control or can't control with some severe economic disadvantage because they're white? Yes, Your Honor. That's the issue for us. But I guess procedurally, the issue, because the IJ maybe didn't quite view it that way, is whether the record compels the conclusion that they were thus disadvantaged. Yes, Your Honor. If I may briefly reply. I mean, I would point out that this Court's defined persecution as infliction of suffering or harm upon those who differ in a way regarded as offensive.  And if they have the incidental impact of discriminating against those who do not benefit from them, that in and of itself is not offensive. I hope that somewhat answers your question. It does. But I think part of the issue being raised here is the contention that it's not merely an affirmative action program, that it's the law as it's being implemented does something more than that. I understand it, Your Honor. And, again, we would point out that if they felt that the law was not being implemented correctly, they should have challenged it underneath the procedures. Thank you. So, Barney, any further? Sir? May I briefly conclude? All right. But you're well over your time. Okay. Again, we were just there. Our government would say because the evidence in this record does not compel the conclusion that South Africa's affirmative action program was deliberately implemented to impose substantial economic disadvantage upon whites or that the crimes that Mr. Gromley was a victim of was a result of his race, as opposed to the desire of his family to enrich themselves, we ask that this petition for review be dismissed and the immigration judge's decision affirmed. Thank you. I guess I have one more question. Do you have other cases in the pipeline from South Africa? I am aware of a case called Jansen v. INS. It was decided by the Ninth Circuit. I wrote the brief in it. But this is the only other case I'm aware of. There it was strictly the crime problem, the fact that there are victims of crimes. And, again, the argument on our appeal was that it was not the result of their race, but just the fact that their families were trying to enrich themselves. Crime is an epidemic problem in South Africa, and I believe the petition for review is dismissed or denied in that case. All right. Thank you. Thank you. You went well over your time, too, but I'll give you one minute for rebuttal. If you could, because I was asked questions at the end, so I wanted to reserve. I just have two comments to make. One is there is a recent South Africa case that was published called Thomas v. Ashcroft, and it's a March 2nd case, but it was talking about a persecution of a white family as a result of violence that this family suffered as a result of the racism of a family member. And it talks about it in terms of being a social group. So it doesn't go into economic issues at all. And in terms of the second point I want to make is that Edith was a government employee. She was terminated by the government to replace with blacks. She worked for Parcel Express, which was a branch of the government. So that's clear. It's not just the private companies, too. The government, of course, was doing it as well. And thirdly, I am familiar that there are cases that South Africans obviously filed in which they were granted asylum. What I am not familiar with is if we have any old cases specifically on economic issues. And if the Court would like, of course, I'd be happy to examine that and brief it. All right. Thank you. Okay. The case of Gormley v. Ashcroft will be submitted. U.S. v. Nelson was dismissed. Gremner v. Feisner will be submitted on the briefs. And we'll take up Lundquist v. Sonnen. Thank you.
judges: Canby, Wardlaw, Gould